THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
TYRONE ANTHONY, a/k/a Tyrone Mann, a/k/a Dallas Mann,
Defendant-Appellant.
Fourth District   No. 13195

Opinion filed September 23, 1976.

Richard J. Wilson and Jeffrey D. Foust, both of State Appellate Defender's Office, of Springfield, for appellant.

Paul R. Welch, State's Attorney, of Bloomington (G. Michael Prall, and Stephen M. Deitsch, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE GREEN delivered the opinion of the court:

Defendant Tyrone Anthony was convicted of armed robbery after a jury trial in the Circuit Court of McLean County and sentenced to imprisonment in the penitentiary for 5 to 12 years. He appeals.

Defendant contends on appeal that he was denied a fair trial because improper remarks were made by the prosecutor during closing argument. He claims that the prosecutor expressed his personal opinion of defendant's guilt, mentioned defendant's failure to produce certain witnesses, and referred to defendant as a liar and that these comments constituted prejudicial error requiring reversal of his conviction. In considering defendant's contentions it is necessary to review the evidence presented at trial.

At approximately 10:15 or 10:20 p.m. on March 31, 1974, two men robbed Mr. Softee's, an ice cream store, in Bloomington, Illinois. The robbers, one of whom carried a gun, took a money bag, the contents of the cash drawer, and personal cash from the three victims, store employees Becky Dunlap and Craig Corbitt and Craig's father John Corbitt.

Although the victims testified that defendant resembled the gunman, none of them were able to positively identify defendant as the gunman either at a lineup conducted the day after the robbery or at trial. They described the gunman as being a husky, black male, 5'8" to 5'10" tall and wearing a turban. Becky Dunlap testified, however, that during the robbery she had recognized the other robber as William Hosea, Jr., an acquaintance of hers for 7 or 8 years and that she had mentioned this to the police when they arrived at the scene of the robbery.

Hosea was called as a prosecution witness and testified that defendant came to his home at about 9:30 p.m. on the night of the robbery and that after taking Hosea's girlfriend home, they drove past Mr. Softee's and decided to rob it. Defendant was the gunman. After the robbery they went to Hosea's house at 608 North Mason to split the money and then defendant left. On cross-examination Hosea stated that he was testifying pursuant to a plea agreement whereby the charge against him was reduced from armed robbery to robbery.

Officer Elijah Rusk testified that he arrived at the scene of the robbery between 10:45 and 11 p.m. and that after talking to Becky Dunlap, he and

another police officer went to 608 North Mason, where they thought they would find Hosea. As they approached the house, they saw a blue Dodge Charger with a black top go down the alley behind the house. When they approached the car, a 5'9" or 5'10" black man bolted from a nearby pile of logs but they were unable to catch him. They then went to 608 North Mason and were directed to an apartment across the alley where they found Hosea and arrested him. The next day police officers found a money bag and a turban in the alley.

Officer John Rhoda testified that he was looking for the robbery suspects on North Mason at approximately 11 p.m. when a black male, approximately 5'9" and 170 pounds, ran in front of his car and was almost hit. Defendant fit the description of the man but Rhoda was not able to make a positive identification.

Mark Bagnell, another police officer, testified that he and Officer Jenkins were on the corner of Roosevelt and Chestnut at approximately 11:20 p.m. when he saw a black man approximately 5'10" tall and weighing approximately 175 to 180 pounds walk by in a hurried manner. He and Jenkins, neither of whom were in uniform, called, "Halt, police," and tried to follow him. In the course of chasing the man, Bagnell saw a man's sleeve underneath an automobile. When he bent down to pull the man out, he was kicked in the head and knocked down. The man ran to the 1100 block of Scott Street, where the officers lost sight of him. He identified defendant as the man they chased and stated that the next time he saw him was some 25 minutes later at defendant's mother's house at 1104 North Oak when defendant was arrested.

Donald Curtis, another prosecution witness, testified that he was currently serving a sentence for forgery pursuant to a plea agreement. On March 27, 1974, he lost his 1968 Dodge Charger with a black vinyl roof to another man in a poker game. Defendant was one of the people Curtis played poker with, and he saw defendant driving the car several times after that. Later, in April 1974, defendant told Curtis that he and Hosea had robbed Mr. Softee's. He also told him that he had kicked a policeman who chased him and that he had had to run so fast he lost one of his shoes.

Defendant was the only witness called by the defense. He testified that he did not go to Mr. Softee's on March 31, 1974, and did not participate in any robbery there. He had a previous conviction for armed robbery in 1971. He stated that from about 6 to 9 p.m. he played ping-pong at Illinois State University. He did not know any of the people there very well. After that he went to his sister's house on Oakland Avenue. He got there about 9:30 and stayed about half an hour. He then went to his mother's house. He stated that later in the evening he went to visit his girlfriend who lived on Scott Street and stayed about 15 or 20 minutes. On the way

back to his mother's house, two men shouted something like "Hey, nigger" and started to chase him. He ran to his mother's house, where he was later arrested.

Defendant testified that he was 5'10" tall and weighed about 185 pounds. He denied scuffling with a police officer or losing a shoe while being chased. He also denied telling Donald Curtis that he had been involved in the robbery.

On cross-examination defendant admitted that he had not told anyone about the events on the night of the robbery until the morning he testified. He did not know if anyone else could testify to his whereabouts on that night. He had never driven Donald Curtis' Dodge Charger. He testified that he was slightly acquainted with some of the ping-pong players including one with "an African name, John Afro," and "a Chinese man by the name of * * * Levene or something * * *." He did not tell his attorney about them until the day he testified, however. His girlfriend's name was Mary Bauman and he met her at Streid's Restaurant where they both worked. He had only seen her a few times before that night and it was the first time he had gone to her house. That was the last time he saw her. He thought she moved to Texas soon after that. He did not tell his attorney about her because he would not be able to locate her. It was about 11:30 or 11:45 when he went to her house. She was not surprised to see him even though she was not expecting him. He only stayed about 15 or 20 minutes because he "wasn't getting across to her."

The State called three rebuttal witnesses, Gary Streid, Ruth Roley and Mary Bauman. Gary Streid, the manager of Streid's Restaurant, testified that although his records for March and April 1974 indicated that defendant had worked there, they did not show any employee named Mary Bauman. He could not identify Mary Bauman in the courtroom. Ruth Roley, a waitress at Streid's, testified that she did not recall that a Mary Bauman had worked there, and she could not identify Mary Bauman in the courtroom, either.

Mary Bauman testified that she had never worked at Streid's and that she was first contacted about the case about half an hour before she testified. She became acquainted with defendant through his brother and wrote letters to him while he was in prison. She saw him a few times in 1974 after he was released. The last time she had a date with him was the end of February 1974. She lived on Main Street in Normal. One night around the end of March 1974, defendant came to her apartment late at night. She was already asleep but woke up when she heard him knocking at the door. When she answered the door, she noticed that he did not have any shoes on and was very excited. She told him to leave, and after a few minutes, he did. She had not seen him since although she was still living at the same address.

In support of his contention that the prosecutor improperly expressed to the jury his personal opinion that defendant was guilty, defendant cites the following remarks made at the conclusion of the prosecutor's closing argument, " \* \* \* I submit to you that if you make a mistake this man goes free back out into the community. I would submit to you that this would be a mistake."

■■ The State argues, however, that although defense counsel objected to the above comment at trial, the issue was not properly preserved for review because defendant's post-trial motion asserted that "the Assistant State's Attorney stated his own opinion and belief of the defendant's guilt" without specifying which portion of the closing argument was being complained of. The State cites *People v. Irwin* (1965), 32 Ill. 2d 441, 207 N.E.2d 76, for the proposition that issues not raised with specificity by a defendant's post-trial motion are deemed to be waived. However, in that case the issues which were deemed waived by the Supreme Court had not been mentioned at all in the post-trial motion. Thus, the case says nothing about the degree of specificity with which issues must be treated in a post-trial motion in order to be preserved for review. We note that in the instant case the trial transcript was not available either when the post-trial motion was filed or when it was argued. Under these circumstances, defendant seems to have done all that could be done to present the issue in the post-trial motion and thereby preserve it for review, and we deem the issue properly before this court.

It is improper for a prosecutor to inform the jury of his individual opinion or belief of a defendant's guilt (*People v. Hoffman* (1948), 399 Ill. 57, 77 N.E.2d 195), unless "he states, or it is apparent,\* \* \* that such opinion is based solely on the evidence. *People v. Lawson,* 331 Ill. 380, 394; *People v. Black,* 317 Ill. 603; 15 I.L.P., Criminal Law, sec. 586." *People v. Williams* (1962), 26 Ill. 2d 190, 193, 186 N.E.2d 353, 355.

In *Hoffman* the court held that although there was evidence in the record to support the prosecutor's argument that defendant should be found guilty, he went too far in expressing his own opinion in the following statement:

"'If I had one slightest reasonable doubt about [defendant's] guilt upon my words as a man and as an American, as a father and grandfather, I would say I do not believe he is guilty and I would dismiss this case. But, I know all the facts in this case as you know various people.'" 399 Ill. 57, 65, 77 N.E.2d 195, 199.

More recently, in *People v. Fuerback* (1966), 66 Ill. App. 2d 452, 456, 214 N.E.2d 330, 332, the court held that the prosecutor's comment in closing argument that "if [he] did not think this fellow was guilty he would have nolled [*sic*] the case" constituted prejudicial error, noting that

the statement did not refer to any evidence upon which the prosecutor's opinion was based. Similarly, in *People v. Hopkins* (1970), 124 Ill. App. 2d, 415, 418, 259 N.E.2d 577, 578, the prejudicial nature of the following statement was recognized by the court:

> " 'The State's Attorney has a larger responsibility to the people than merely to prosecute those people who may have run afoul of the law. He has a duty to protect the innocent. He has a duty to dismiss cases when they are not properly based and founded and we have dismissed cases here that have not been properly brought against the defendant and this is one, however, against these two comparatively young men that I could not have in good conscience dismissed, that I could not in good conscience let go without prosecution.' ".

In holding the statement to be improper, the court stated that there was no reference to any evidence on which the prosecutor's opinion was based.

On the other hand, in *Williams* the court concluded that the following statement made at the conclusion of the prosecutor's closing argument was proper because it was apparent that the statement was based solely on the evidence:

> " '* * * then coupling all that with statements made by defendant, I think that when you go back there, you will reach the same conclusion that we have reached, and that is that [defendant] is guilty of the charge of murder.' " (26 Ill. 2d 190, 193, 186 N.E.2d 353, 355.)

In that case a similar statement made by the prosecutor in his opening statement after he summarized the evidence to be presented was also held to be proper.

In *People v. Lomax* (1970), 126 Ill. App. 2d 156, 163, 262 N.E.2d 63, 66, the court concluded that the following statement of the prosecutor, which was made during closing argument after the evidence against defendant had been summarized, was an opinion based on the evidence:

> "We are here to protect even the defendant Lomax. Because if he is not guilty, ladies and gentlemen, it isn't our job to put him in the penitentiary. But we are saying to you right now that that defendant is guilty of murder * * *. Purely and simply that."

■■ In the instant case, the language of the prosecutor's comment does not clearly indicate that he was expressing his individual opinion of defendant's guilt. The expression "I submit to you" is commonly used in argument in the sense of "I offer to you for your consideration." (See Webster's New World Dictionary (2d college ed.).) Even assuming, however, that the jury would interpret the prosecutor's statement as an

expression of his individual opinion, the statement was made after the prosecutor had summarized the evidence against the defendant, and it is apparent that the statement was based on the evidence.

Defendant also contends that the closing argument was prejudicial because the prosecutor improperly commented on defendant's failure to call the ping-pong players and Mary Bauman as witnesses and characterized defendant as a liar. The statements complained of by defendant on these grounds include the following:

> "He has been charged with this, he says, since August, and he tells you that the very first time he tells Mr. Schwulst about this story about where he was on the evening in question, out playing ping-pong with people he can't tell, and also out with his girlfriend, Mary Bauman, who he met out at Streid's, this morning.
>
> Now, I submit to you, ladies and gentlemen, if it is true that that is the case, if that is the case that would explain why Mr. Schwulst was not able to get any other witnesses here. The State managed to do so over the noon hour. If that is the case, there is only one reason why he waited until this morning to tell Mr. Schwulst, is because he knew that that would not give us enough time, ladies and gentlemen, to check out his alibi.
>
> * * *
>
> * * *. He says he was not with Hosea that night. He says he was out playing ping-pong. He says that he has no witnesses. He says that he never tried to locate any of those witnesses. It is his word against theirs, ladies and gentlemen, and who has got the most to lose here?
>
> * * *
>
> Ladies and gentlemen, every man has a right, who is charged with a crime, to have a Jury decide whether he is innocent or guilty, and that is fine. But, no man, ladies and gentlemen, has got the right to get up on the witness stand and commit perjury. I don't care who you are or what the consequences of your telling the truth are, nobody has the right to get up here and swear under God, I'm going to tell the truth, and then get up there and lie to you."

The State argues that defendant waived the right to complain of the prosecutor's comments concerning defendant's failure to call the witnesses by failing to object to them at trial. Since these comments were intermingled with the remarks characterizing defendant as a liar, to which defendant did object, it is difficult to determine whether or not they were included in the objection. We need not decide this question, however, since we conclude that the prosecutor's statements regarding defendant's failure to call the witnesses did not exceed the proper bounds of closing argument.

■■ Although as a general rule it is improper for the prosecution to comment on defendant's failure to present witnesses when such witnesses are equally accessible to both parties (*People v. Rubin* (1937), 366 Ill. 195, 7 N.E.2d 890), potential alibi witnesses injected into the case by the defendant are deemed unavailable to the prosecutor and comment with regard to the failure of such witnesses to testify is proper. (*People v. Swift* (1925), 319 Ill. 359, 150 N.E. 263; *People v. Lenihan* (1957), 14 Ill. App. 2d 490, 144 N.E.2d 803; *People v. Gray* (1965), 57 Ill. App. 2d 221, 206 N.E.2d 821.) In the instant case, defendant referred to the ping-pong players and his girlfriend in his direct testimony, thereby injecting potential alibi witnesses into the case. Defendant now contends that these witnesses were not alibi witnesses since they would not have been able to testify to defendant's whereabouts at the exact time of the commission of the robbery. However, by his testimony it is reasonable to assume defendant tried to prove his activities for time periods shortly before and after the robbery.

One of the potential alibi witnesses, the girlfriend, Mary Bauman, was located and called as a witness by the State. The prosecutor's comment on defendant's failure to call her as a witness related to defendant's credibility in not telling his counsel about the witness until the morning he was to testify. This leads to consideration of defendant's contention that the prosecutor's remarks were prejudicial because they referred to perjury and characterized defendant as a liar. Comments referring to defendant as a liar or perjurer, like other comments expressing belief in defendant's guilt, are improper unless based on the evidence. *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880, *reversing* 23 Ill. App. 3d 907, 320 N.E.3d 442 (majority apparently agreed with the appellate court's conclusion that the prosecutor's statement calling defendant a liar was improper, but unlike the appellate court, held that that statement together with other improper statements by the prosecutor constituted reversible error); *People v. Broadnax* (1975), 26 Ill. App. 3d 67, 325 N.E.2d 23.

■■ In *People v. Brown* (1974), 20 Ill. App. 3d 1064, 313 N.E.2d 488, this court indicated that while the issue may have been waived by defendant's failure to object at trial, the State's Attorney's statement characterizing as perjury the defendant's and three other defense witnesses' testimony that defendant was in a parked car when arrested was not error because it was based on the contradictory testimony of nine police officers who stated that they were eyewitnesses to defendant's arrest inside a building being burglarized. (See also *People v. Nicks* (1974), 23 Ill. App. 3d 443, 319 N.E.2d 524.) In the instant case, defendant's testimony was highly unbelievable and contradicted in several respects by the testimony of William Hosea, Donald Curtis, Mary Bauman, and several police officers.

Accordingly, for the reasons stated above, the judgment of the Circuit Court of McLean County is affirmed.

Judgment affirmed.

TRAPP, P. J., and REARDON, J., concur.